**In re ANNICOTT EXCELLENCE, LLC, Debtor.**

No. 99–8363–3F1.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Jan. 18, 2001.

---

Gregg W. McCloskey, Boca Raton, FL, for Allied.

Daniel M. Litt, Washington, DC, for La-Salle and Allied.

David E. Otero, Jacksonville, FL, for debtor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This Case is before the Court on the Motion for Relief from Automatic Stay filed by Allied Capital Corporation ("Allied") for itself and as Special Servicer for LaSalle National Bank ("LaSalle"), an indenture trustee, on October 13, 2000.[1] (Doc. 143.) On November 16, 2000, the Court held a hearing on the Motion for Relief from Automatic Stay and elected to take the matter under advisement. Upon review of the evidence presented and upon review of the arguments and submissions of counsel, the Court denies Allied and LaSalle's Motion for Relief From Automatic Stay.

### FINDINGS OF FACT

Annicott Excellence, LLC ("Debtor"), a Delaware limited liability corporation, owns and operates five mobile home parks in the state of Florida ("the properties"). Debtor is a subsidiary of Annicott World Enterprises, Inc. ("Annicott Worldwide"), a Nevada corporation. Three of Debtor's properties are located in Broward County and two in Brevard County.[2]

On August 29, 1997, Debtor executed a Promissory Note "A" promising to pay

---

1. The Court notes that Allied and LaSalle prosecuted this Motion through the same counsel and made no independent, individual arguments.

2. The properties are located at: 1) 715 SW 5th St., Hallandale, Florida; 2) 2701 Park Road, Hallandale, Florida; 3) 4651 Sarno Road, Melbourne, Florida; 4) 700 Friday Road, Cocoa, Florida; 5) 2600 Pineapple Ave., Melbourne, Florida.

Allied Commercial Capital Corporation, predecessor-in-interest to Allied, $7,070,000.00. This obligation became Allied Capital Commercial Trust 1998–1, of which LaSalle serves as indenture trustee and custodian. On the same day, Debtor executed a Promissory Note "B" indicating a promise to pay Allied a separate $808,000.00.

As security for the loans underlying these notes, Debtor granted Allied's predecessor-in-interest security interests in the properties, improvements and fixtures upon the properties, all leases and subleases on the properties, and all income from the properties.

On September 4, 1997, Allied's predecessor-in-interest perfected the security interests on the Broward properties by filing a mortgage with the Clerk of Court in Broward County. On September 7, 1997, Allied's predecessor-in-interest perfected the security interests on the Brevard properties by filing a mortgage with the Clerk of Court in Brevard County.[3]

On September 21, 1999, Allied, for itself and as servicer for LaSalle, commenced foreclosure proceedings against Debtor in the Seventeenth Circuit Court in and for Broward County, Florida ("the state court foreclosure proceeding").[4]

On October 14, 1999, Debtor and its parent, Annicott Worldwide, entered into a guaranty in order to settle a lawsuit brought by Kurtell Sales Corporation, Inc. ("Kurtell Sales"). (Ex. 1 to Claim 18.) Pursuant to the guaranty, Debtor promised to pay $200,000.00 and granted Kurtell Sales a security interest in the mobile homes on the properties.

On November 1, 1999 ("the petition date"), Debtor filed a voluntary petition for Chapter 11 bankruptcy protection, bringing the state court foreclosure proceeding to a halt.

According to Allied, as of the petition date, Debtor owed LaSalle as indenture trustee a total of $7,428,167.93 under Promissory Note A—$6,961,374.47 in principal, $355,320.15 in accrued non-default interest, $64,972.83 in accrued default interest, and $46,500.48 in late fees, plus costs.

Allied further contends that on the petition date, Debtor owed Allied a total of $873,387.42 under Promissory Note B— $804,118.22 in principal, $51,908.38 in accrued non-default interest, $7,505.10 in accrued default interest, and $9,855.72 in late fees plus costs.

On November 1, 1999, Debtor filed its schedules and Statement of Affairs. Debtor's Schedule D indicates that Allied holds an $804,111.22 claim against Debtor. (Mov. Ex. 2.) Schedule D additionally indicates that LaSalle holds a $6,961,374.47 claim against Debtor.

In its Schedule A, Debtor values all five properties at a total of $7,000,000.00. Debtor's Schedule D indicates a total of $8,095,492.69 in claims secured by the properties, spread among five secured creditors: LaSalle, Allied, Kurtell Sales, the Broward County Tax Collector, and the Brevard County Tax Collector.

According to Debtor's Schedule F, unsecured, nonpriority claims as of the petition date total $357,362.76.

On December 21, 1999, the Court entered a stipulation providing for use of rents by Debtor and providing for adequate protection for LaSalle and Allied. (Doc. 45.) In paragraph 3(b), the stipulation memorializes the claims asserted as due by Allied and LaSalle on October 31,

---

3. Mortgages recorded in Broward County at Book 26945, Pages 0143–0179 ("Broward County 'A' Mortgage") and Book 26945, Pages 0180–0216 ("Broward County 'B' Mortgage"). Mortgages recorded in Brevard County at Book 3705, Pages 3951–3987 ("Brevard County 'A' Mortgage"), and at Book 3705, Pages 3988–4024 ("Brevard County 'B' Mortgage").

4. *Allied Capital Corp. v. Annicott Excellence, LLC and Annicott World Enterprises, Inc.,* Case No. 99–016322.

1999—$7,428,167.93 to LaSalle and $873,387.42 to Allied. The Stipulation did not preclude later objections to these claims or later motions for valuation.

On January 8, 2000, Andrew Singer ("Singer") filed a Proof of Claim against Debtor in the amount of $1,585,750.00. (Claim 7.) Singer, manager of one of Debtor's Broward properties, alleges that he incurred that amount in costs and earned that amount in labor for some emergency flood drainage and repair work done in June, 1999 at one of the Broward properties. Singer claims a $3,000,000.00 security interest in the Broward property he managed.

Debtor did not list any debt owed to Singer in its schedules.

On February 28, 2000, Debtor filed an Objection to LaSalle's Claim as Stipulated. (Doc. 80.) Debtor alleges that it owes LaSalle a total of $7,240,033.36 – $6,936,558.88 in principal plus $303,474.48 in accrued non-default interest.

On February 28, 2000, Debtor also filed an Objection to Allied's Claim as Stipulated. (Doc. 81.) Debtor alleges that it owes Allied a total of $844,161.83 – $798,261.77 in principal plus $45,900.06 in accrued non-default interest.

On February 28, 2000, Debtor commenced Adversary Proceeding No. 00–76 against LaSalle and Allied to Determine Validity, Priority, or Extent of a Lien or Other Interest in Property. (Doc. 83.)

On February 29, 2000, Debtor filed its Disclosure Statement and Plan of Reorganization. (Docs. 84 and 85, respectively.)

Debtor's Plan provides for seven classes. Class 1 consists of the allowed claim of the Brevard County, Florida Tax Collector as secured by a tax lien on the Brevard properties. Class 2 consists of the allowed claim of the Broward County, Florida Tax Collector as secured by a tax lien on the Broward properties. Class 3 consists of the allowed secured claim of LaSalle. Class 3 consists of the allowed secured claim of Allied. Class 5 consists of the allowed secured claim of Kurtell Sales. Class 6 consists of all allowed nonpriority unsecured claims. Class 7 consists of any interests retained by old equity insiders ("Allowed Member Interests").

On March 24, 2000, Kurtell Sales filed a Proof of Claim in the amount of $200,000.00 "plus interests, costs, and attorney's fees." (Claim 18).

On March 29, 2000, Allied filed an Opposition to Debtor's Objection to its Claim. (Doc. 97.) LaSalle filed an Opposition to Debtor's Objection to its Claim on the same day. (Doc. 98.) Both Oppositions assert that the amounts allegedly owed by Debtor as noted in paragraph 3(b) of the Stipulation on Adequate Protection (Doc. 45)—$7,428,167.93 to LaSalle and $873,387.42 to Allied—correctly quantify Debtor's indebtedness to LaSalle and Allied.

On May 16, 2000, Allied and LaSalle filed a combined Objection to Debtor's Disclosure Statement. (Doc. 108.) Allied and LaSalle contended that the disclosure Statement did not satisfy the requirements of 11 U.S.C. § 1125. LaSalle and Allied additionally argued that the disclosure statement should be rejected because it accompanied a Plan that was patently unconfirmable. LaSalle and Allied argued that the Plan could never be confirmed because of the allegedly meager and delayed injection of "new value" into Debtor by the Class 7 "old equity" retaining control of the reorganized entity and because no impaired class would vote to accept the Plan. LaSalle and Allied also contended that the Plan was unfeasible.

On May 22, 2000, Lynn Houle ("Houle"), as guardian of a deceased minor, Steven Houle, and on her own behalf, filed two Proofs of Claim in the amounts of $10,000,000.00 and $3,000,000.00 against Debtor. (Claims 20 and 21, respectively.) Houle's Proof of claim indicates that this admittedly unsecured claim stems from "personal injury/wrongful death" damages incurred on February 10, 2000.

Debtor filed its schedules on November 2, 1999, apparently three months before any claim of Houle arose. Obviously, Debtor did not include Houle's alleged claim in its schedules.

On May 26, 2000, Debtor filed an Objection to Houle's claims. (Doc. 109.)

On May 31, 2000, Allied filed a Proof of Claim in the amount of $873,387.42 on its own behalf. (Mov. Ex. 4.) On the same day, Allied filed a Proof of Claim in the amount of $7,428,167.93 on behalf of La-Salle. (Mov. Ex. 5.)

On June 9, 2000, Houle responded to Debtor's Objections to her claims. (Doc. 114 and 115.) Houle argues that her personal injury investigation evidences liability on Debtor's part for the suffering and death of her son in a fire in a home on one of the properties and liability to Houle directly under Florida's wrongful death statute.

On June 23, 2000, the Court entered an Order granting a Joint Motion to Consolidate the Objections to the Claims of La-Salle and Allied with Adversary Proceeding 00–76. (Adv. Doc. 12.) Trial on this Proceeding is set for February 1, 2001 (Adv. Doc. 16.)

On June 26, 2000, Debtor filed an Objection to Singer's claim on the grounds that Singer had no factual or legal basis to support his claims of tort and/or contract liability. (Doc. 118.)

On July 24, 2000, Singer filed a Response to Debtor's Objection. Singer revealed that on July 16, 1999 he filed a lien on the Broward property that he had allegedly repaired and drained.[5] Singer additionally noted that he filed a suit in state court to collect on the lien. Singer asserted that the suit had been stayed by Debtor's bankruptcy filing.

On October 2, 2000, the Court entered an Order conditionally approving Debtor's

Disclosure Statement, pending an amendment outlining more specifically Debtor's criteria for valuation of the properties at $7,000,000.00, the experience of Debtor's principals, historical financial information, and an estimation of administrative claims to be paid upon confirmation. (Doc. 136.) The Court did not rule on LaSalle's and Allied's assertions that the Plan could never be confirmed, finding such arguments inappropriate in the Disclosure Statement approval context.

On October 12, 2000, Debtor amended the Disclosure Statement as ordered. (Doc. 142.)

On October 13, 2000, Allied and LaSalle filed the instant Motion for Relief from Stay. (Doc. 143.) The Motion relies largely on two of the "patently unconfirmable" arguments contained in the Objection to Disclosure Statement—first, that no impaired class would vote for the Plan; and second, that the contributions of Class 7 old equity did not satisfy the "new value" exception to the absolute priority rule. Allied and LaSalle omitted their assertions of the Plan's unfeasibility.

LaSalle and Allied attached to the Motion for Relief a Declaration signed by Kurt Wallach of Kurtell Sales indicating that Kurtell Sales would not vote for any Plan proposed by Debtor.

On October 17, 2000, Debtor commenced Adversary Proceeding 00–329 against Andrew Singer to Determine Validity, Priority, or Extent of Lien. (Doc. 150.) On November 27, 2000, Singer responded to Debtor's Complaint with an Answer. (Adv. Doc. 5.)

On October 31, 2000, the Court entered an Order approving Debtor's Amended Disclosure Statement. (Doc. 155.) The Court fixed January 4, 2001 as the deadline for filing Acceptances or Rejections of the Plan, and set the confirmation hearing for February 8, 2001.

---

5. This lien is recorded in Book 29667 of the Public Records of Broward County, at Page

32.

On November 14, 2000, Allied satisfied the claim of the Brevard County Tax Collector. (Mov. Ex. 12.)

On November 16, 2000, Allied satisfied the claim of the Broward County Tax Collector. (Mov. Ex. 11.)

On November 16, 2000, the Court held a hearing on the Motion for Relief from Stay. (Doc. 157.) The Court took the matter under advisement in light of the novel legal issues involved and solicited submissions from both parties.

At the hearing, Allied and LaSalle introduced appraisals of the properties commissioned by Allied and LaSalle and conducted in February 2000. (Mov. Ex. 6–10.) According to these appraisals, the properties are worth a total of $7,783,000.00.

On December 14, 2000, the Court served creditors with notice of the approval of the Amended Disclosure Statement and provided creditors with ballots. (Doc. 165.)

## CONTENTIONS OF THE PARTIES

■ Allied and LaSalle contend that they are entitled to relief from the automatic stay under 11 U.S.C. § 362(d)(2). Under § 362(d)(2), a court shall grant relief from the automatic stay if a creditor shows that a debtor lacks equity in the property and debtor fails to show that the property is necessary for an effective reorganization. Allied and LaSalle argue that there is no equity in the properties and that the properties are not necessary for an effective reorganization because no effective reorganization is possible on account of the ability, and stated intent, of Allied, LaSalle and Kurtell Sales to prevent the only impaired class, Class 6, from accepting the Plan, thus blocking confirma-

tion under 11 U.S.C. § 1126(c) and 11 U.S.C. § 1129(a)(10).[6]

Debtor responds that relief from stay is unwarranted because Allied, LaSalle and Kurtell Sales do not control a sufficient majority of the Class 6 debt to prevent Class 6 from accepting the Plan and making further proceedings toward confirmation futile. Debtor further argues that relief from stay should not be granted so soon before the confirmation hearing and so deep into the Case.

## CONCLUSIONS OF LAW

### I. THE § 362(d)(2) STANDARD

■ Section 362(d)(2) provides, in relevant part:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization . . .

11 U.S.C. § 362 (2000). A party moving for relief from stay under § 362(d)(2) must first show that a debtor has no equity in the collateral at issue. *See* 11 U.S.C. § 362(g). The burden then ordinarily shifts to a debtor to show that the collateral is necessary to an effective reorganization. *See id.*

■ However, the Court finds that, in situations where a creditor seeks to convince a court to dismiss a case on the

---

**6.** Allied and LaSalle also contend that the Plan is patently unconfirmable because the proposed injection of new value by Debtor's management is insufficient to satisfy the "new value exception" to the absolute priority rule as laid out in *Bank of America Nat'l Trust & Savings Ass'n v. 203 North LaSalle St. Partnership,* 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). The Court agrees with Debtor that this objection is premature. The new value exception, 11 U.S.C. § 1129(b)(2)(B)(ii) does not come into play until a debtor attempts cramdown of a rejecting class of impaired, unsecured creditors. Until such time as an impaired, unsecured class actually rejects the Plan, triggering a cramdown, the rule of *203 N. LaSalle* need not be considered.

grounds that continuation of the statutory confirmation process is futile, the burden rests on a moving creditor to show futility by a preponderance. It is the moving creditor that possesses the evidence of the alleged inevitable rejection of a plan—generally, the size of its claim and its resolve to vote against any plan. A debtor should not be forced into winning a claim valuation battle in order to save a case in this context. Additionally, commonsense dictates that a debtor should not be forced to prove that a creditor's statement of intent to vote against a plan is false.

With that burden in mind, the Court proceeds to determine whether or not it should foreclose the soon-to-be-completed balloting process and grant Allied and La-Salle relief from stay.

## II. EQUITY IN THE COLLATERAL

Allied and LaSalle brought forward sufficient evidence to show that Debtor had no equity in the properties. Debtor did not contest that, whichever appraisal the Court uses and whatever the result of Debtor's claim objections, the debt secured by the properties outstrips their value. The Court does not, by finding lack of equity, make any ruling as to the validity of any particular appraisal of the properties or as to any claims or claim amounts. The Court simply holds that, for § 362(d)(2) purposes, Debtor has no equity in the property.

## III. NECESSITY TO AN EFFECTIVE REORGANIZATION

### A. Reorganization "in prospect": feasibility and confirmability

■ In order for a debtor to satisfy a court that collateral is necessary to an effective reorganization, a debtor must first show that an effective reorganization is "in prospect." *See United Savings Ass'n v. Timbers of Inwood Forest Associates Ltd.*, 484 U.S. 365, 374, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). A debtor must do more than merely show that there is con-

ceivably a possibility of reorganization. *See id.* at 375, 108 S.Ct. 626. A debtor must make a showing that an effective reorganization is reasonably possible within a reasonable time. *See id.* at 376, 108 S.Ct. 626.

Generally creditors moving for relief provide a court with some proposed fatal flaw that renders further bankruptcy court supervision over the collateral at issue futile. These flaws general break down into feasibility flaws and confirmability flaws.

■ Most § 362(d)(2) motions for relief from stay in Chapter 11 cases are predicated upon accusations that a debtor's plan of reorganization is patently unfeasible. "If no reorganization of the debtor is feasible, then no property of the debtor can be necessary for that end." *Resolution Trust Corp. v. Swedeland Development Group Inc.*, 16 F.3d 552, 567 (3d Cir.1994).

Other creditors seeking § 362(d)(2) relief from stay argue that an effective reorganization is not "in prospect" because a debtor cannot obtain confirmation of his plan of reorganization, no matter how feasible it is. *See Swedeland*, 16 F.3d at 567. For example, in *Swedeland*, the court granted relief from stay on the grounds that the creditor seeking relief controlled the only impaired class and thus could, and promised it would, block confirmation of any plan of reorganization. *See id.* at 568. "Swedeland cannot receive the necessary affirmative vote of the class of unsecured creditors without Carteret's acceptance of the plan ... Carteret asserts that it will oppose any proposed plan ... [t]hus, for this reason alone, an effective reorganization is not realistically possible." *Id.*

### B. Application to the instant case

■ Allied and LaSalle did not bring forward sufficient evidence to prove by a preponderance that reorganization is not in prospect.

Allied and LaSalle failed to bring forward sufficient evidence to show by a preponderance that they could guarantee voting control over Class 6. Allied and

LaSalle base their assertions of two-thirds voting control over Class 6 on the assumption that this Court must find the large, potentially unsecured claims of Houle and Singer "frivolous" at this time and therefore ignore those claims in determining whether the undersecured portion of debtor's indebtedness to Allied and LaSalle constituted two-thirds or more of Debtor's unsecured, nonpriority debt. Allied and LaSalle assert that Debtor's total unsecured indebtedness to other creditors amounts to only $357,362.76, a paltry sum compared to Allied, LaSalle and Kurtell Sale's asserted total unsecured claims of $1,301,555.35. Allied and LaSalle specifically state in their Reply Memorandum that their claims, along with those of Kurtell Sales, another possible dissenter,[7] control Class 6 under Debtor's calculations "without considering the claims of Ms. Houle and Andrew Singer." *See* Movant's Reply, at 8.

By basing their entire claim of control on the supposed frivolity of Singer's and Houle's claims, Allied and LaSalle ignore those two 600–pound gorillas lying around in Class 6. Singer filed a Proof of Claim for $1,585,750,000.00. Houle filed two proofs of claim totalling $13,000,000.00. The Court cannot dismiss Singer's and Houle's massive, potentially class-controlling claims offhand and "lay them to rest" based on Allied's and LaSalle's attestations of worthlessness and unsupported assertions that Singer and Houle will vote to reject. The Court finds it possible that those claims might be sustained as unsecured, nonpriority, non-trade Class 6 debt in amounts significant enough to prevent Allied, LaSalle and Kurtell Sales from controlling Class 6.

The fact that Debtor has objected to the claims of Singer and Houle is irrelevant. The proofs of claim timely filed by Singer and Houle are prima facie evidence of those claims, and must be considered by the Court as valid until objections have been resolved. Until then, any dismissal of the claims of Singer and Houle as "frivolous" is premature.

Additionally, Allied and LaSalle did not bring forward evidence of the sort of exigent circumstances that typically accompany relief from stay on "confirmation futility" grounds, such as collateral waste, bad faith by a debtor, or preservation of judicial resources. Ballots in this Case are out. The confirmation hearing is set for February 8, 2001. Allied and LaSalle did not bring before the Court any evidence tending to show any justification for the Court to prematurely abort the carefully constructed Code confirmation process less than one month before its climax.

The Court notes that Allied and LaSalle's Motion for Relief from Stay sounds strangely familiar—it is yet another request that a Florida court call the result of an election before all the ballots can be counted. However, Allied and LaSalle presented no evidence of any compelling public interest in halting the hand count in the instant Case.

## CONCLUSION

The Court finds that Debtor does not have equity in the properties. However, the Court finds that Allied and LaSalle failed to prove by a preponderance that there is no possibility of confirmation. Therefore, the Court finds that confirmation, and thus an effective reorganization, are "in prospect" and therefore that relief from stay should be denied.

The Court will enter a separate Order in accordance with these Findings of Fact and Conclusions of Law.

---

**7.** The Court does not find it necessary to rule on the admissibility of the unsworn out-of-court assertion by Kurtell Sales, which is not a party to the instant Motion, that it will oppose the Plan. The Court considers the possibility of Kurtell Sales dissent. The Court additionally notes that the relatively small size of Kurtell Sales' eventual unsecured claim, as admitted to by Allied and LaSalle, deprives Kurtell Sales' vote of capital importance.